Mr. Provenansky, you may proceed. Yes. Good morning, Your Honors. We are planning today to address three issues that occurred during the trial and particularly the motions in Modesto-Alarcon. And I want to begin chronologically with the motion to quash arrest and suppress evidence. We believe, Anne, that the evidence during the hearing did show that an unlawful detention and seizure did occur outside the home. The pat-down? Not particularly. Even before the pat-down, that when the three Homeland Security officers came up to Mr. Alarcon as he was exiting the vehicle, and they did admit that they came to him quickly. They're wearing police vests. Two, you can see their guns are present. There were cars up and down the street. There was almost no parking whatsoever. We believe that it was even prior to the pat-down that the Mendenhall factors would be relevant, that they're asking him questions. Well, let me ask you this. I mean, if we were in the realm of material stuff, isn't the law that the police can approach anyone in a public place and attempt to engage them in conversation? And they have no obligation to cooperate or respond. So you're saying the fact that somebody walked up to, police walked up to somebody on the street, is per se illegal? Well, I wanted to also mention that in both briefs, both sides admitted that this was not a trip. There was not even reasonable articulable suspicion at that time for a Terry stop. Right. Or a detention. But you seem to be saying the fact that they approached him was per se illegal. It was more than the approach. The perimeter had been set up. There were uniformed officers. The question is, did he, a reasonable person in his position, feel that he was free to walk away from this encounter? Now, I don't, we do not believe that a reasonable person would have felt that they were free to walk away from three police officers, uniformed police officers on the block, both marked and unmarked cars and a perimeter set up. So what point does it become an illegal seizure? The mere approach? That's what I'm trying to call out from your argument. It's the approach. It can be even the showing of weapons, the show of authority, as Mendenhall stated. I believe this was a, this was a large police presence and a show of authority on what the state wants to state is a consensual encounter. We do not believe it's a third tier consensual encounter. And then on top of that, I'm going to add the six times that our client did testify that he was, body was patted down for a protective pat down. And we, that certainly has changed the nature of the encounter because I believe Mendenhall said it's both a show of authority, but also for a touching of the person could also change the encounter. What did the trial judge opine on that? It seemed to me, trying to look at this carefully, the trial court made no definitive ruling as to whether or not there was even a search warrant. Yes, it was. The judge's opinion was ambiguous. And then what I found interesting is. It was really ambiguous. He said, he said, even if I don't find there was a pat down, but even if there was a pat down, it was so cursory that anything that may have occurred afterwards was attenuated. Isn't that his finding though? I believe it was in paragraph 16 where he did also, if it occurred, that it would still be okay within a consensual encounter. And we believe obviously that that's an erroneous legal decision. I also wanted to mention that the neighbor, and it was unrebutted, a protective pat down. The testimony from the three Homeland Security officers, two said they could not recall. And then one interestingly said, it is customary for me to do a protective pat down when I'm approaching an individual who's a target of a narcotics investigation. Which obviously is a violation of people versus flowers because they are separate inquiries. Protective pat times. You can't make generalized statements such as I'm in the midst of a narcotics investigation, so I'll just do a protective pat down. It has to be the fear of safety for yourself or your other fellow officers. And there was never any testimony other than that our client was cooperative throughout each and every phase. Well, we know the state of the record. Let's assume that the record indicates there was an illegal pat down. So I think inexorably and inevitably we're going to get into the issue of attenuation. Right. And speaking about the attenuation, there was no significant passage of time between the time when we believe there was an illegal protective pat down and going into the house, which just to briefly talk about going into the house, all three Homeland Security officers stated a desire to go into the house. And was it a command? Was it in English or in Spanish? I don't think the record was very clear on that. Didn't one indicate he spoke Spanish? Yes, the female Homeland Security did, and they would flip-flop between Spanish and English throughout the encounter with our client. She did speak Spanish. There was a desire to go in the house. And then the written consent, there was just minutes between meeting him on the street, I believe it was 4.25 p.m., and the signed written consent was maybe 4.20 they met up, and the signed written consent was 4.30. There was a 10-minute lag between everything, between the encounter on the street until sitting at a dining room table and signing it. One of the factors to consider is that in the courts have outlined the factors to consider whether or not the consent was sufficiently attenuated from the illegal search. And one of them, as I understand it, is the quote-unquote flagrancy of the alleged police misconduct in this case. This, under all accounts, Margaret, was a brief pat-down. Cursory, it was not somebody thrown up, you know, thrown to the ground or handcuffed or anything. Is that not true? It was a brief pat-down? Yes, I'm just not sure how patting your body, a police officer patting your body down, cursory, whether cursory or not, it's still a touching, which is a meant and all factor of the individual by police, where they're trying to say it's a consensual encounter. And that's my point. Well, I don't know if it's a consensual encounter, but when you talk about the flagrancy of the circumstances, we have to read something into what is meant by flagrancy. And any pat-down necessity is going to involve a touching of somebody, is it not? Of course. So we have to have some distinction between a flagrant, if you will, violation and a minor intrusion. It seems here that this was a minor intrusion because it was a pat-down, not a full body search, correct? Yes, you are correct. You're a pat-down prior to them entering his home. Yes, it is the pat-down prior, but we believe the attenuation with the small passage of time and no other intervening circumstances. And by the way, at this point, the consent is signed inside the home where they have already moved family members into the living space. They've looked around the house to check to make sure that there were no weapons where they were seating the individuals. There was a brief safety. They checked the bathroom. There was really no intervening circumstances. And we believe, I want to focus on, was the consent knowing and voluntary? And obviously the state has that burden. But what I found really interesting about the Spanish consent to search form, where the state wants you to take judicial notice and then they give you this Google Translate document, you look at the Google Translate and you're like, whoa, that is not translated to a consent to search of a home, a car, and a garage. It says their own Google Translate talks about to register the home, the car, and the garage. And they also even describe it in the Google Translate that they want you to take judicial notice of because there was no interpretation of the document spoken about on the record. And no time did a court interpreter read the consent to search and say on the record what it said. On that topic, let me ask you a very pointed question. Okay. Was there any evidence in the record that the defendant at any time stated that he didn't understand the form or asked any questions about the form? He did say there was a lot of papers and he didn't see nowhere. They denied that there were a lot of papers on the dining room table. At one point they said there might have been some papers, maybe an English consent to search form. But did he ever raise questions about it? I think that's an important consideration. Did he express, did he tell anybody, was there any testimony at the trial that he was confused by the form, he didn't understand it, he had questions about it? I didn't see that. I would agree with you that that was not in the testimony, Your Honor. I would agree. I mean, that would be important. On your point, that would not support your point? Yes, Your Honor, I do agree. Obviously, we were not the attorneys on the motion to cause arrest and suppress evidence. We came later in. But I just did find that the form in and of itself never being translated on the record from Spanish to English is a large problem to know if it's a knowing and volunteering. Because assuming that he read it and got the language that the Google translated that the state provided, it really doesn't say consent to search. They even used the term search warrant when we know it wasn't a search warrant. Well, shouldn't that have been something maybe that the defense attorney should have done? Probably. You've got another avenue down the road. Yeah, that's certainly. I was wondering if I could move on. Because I'm asking myself how it makes sense that the defendant himself didn't say he was confused or misled. Yes, I do think, though, the lack of the knowing and voluntary aspects of the consent to search cannot be assumed when it was never translated by a court interpreter. Okay. I was going to move on to the motion to suppress statements, which obviously the Fifth Amendment and the state's burden. I find this one a more telling issue for our client, because he is now in an interrogation room. And then I like that the homeland security officers are saying that we are just talking to him about breaking for the first seven minutes. We're just breaking the ice or asking him pedigree questions, booking questions. But that's not exactly true, because they have moved into things like, how did you get into this country? What type of documentation had you used? They admitted that. So what you have is incriminating statements. Was he charged with those? No, he wasn't charged, but they are homeland security. And those are federal charges, illegal reentry. So here they are asking him incriminating questions about his status and background. Then they immediately follow them up with, oh, and by the way, let's talk about if you cooperate, there can be leniency in the court or by judges. But, oh, the judge makes the ultimate decision. And then they immediately follow up, and this was their testimony, all three homeland security officers, they immediately follow up after the speaking about leniency. They go, and these aren't their words, we want to speak to you about the heroin found inside your house. And my point is, that's not a neutral statement. They can say, it's just a statement, it's just a declaration. Well, they didn't say, do you have heroin inside your house? They said, we want to talk to you about the heroin inside your house, right? Right. It doesn't necessarily, as Rhode Island versus Innis says, it doesn't have to be in the form of a question. All you have to do is deconstruct that statement because you already have an illegal substance here. You already have it, it's in your house here. And then what are we missing for constructive possession? We're missing the element of knowledge. How do we get that element of knowledge? We need an oral statement. So we purposely have seven or eight questions of breaking the ice. We talk about leniency, and then we mention, oh, heroin, illegal substance, your house, but we need some knowledge. I think there was a purposeful violation of Miranda because we also know that when they questioned a female who was involved in the investigation, upon entering the interrogation room, she was given her Miranda warnings. And we wouldn't even have this motion if the Homeland Security officers had introduced themselves and said, oh, and here's a Miranda warning waiver, these are your rights. Wouldn't he probably have given the same information? He might have, but we do have a violation, and that's my whole point. I think it was purposeful to elicit a statement about the heroin. Did it really require a response under the Jones case? They'd say, we'd like to talk to you about the heroin in your house. Does that require a response by the defendant? In Jones, they were saying the guy was pestering the officer, I want to get my car, I want to get my car keys. And in Jones, he says, oh, we found a gun in the glove compartment. The locked glove compartment. Right, and what difference is, that's not per se illegal, having a gun in your locked glove compartment, because if you have an FOID, you're correctly transporting your weapon in a gun, I'm sorry, in a car, versus it is per se illegal to have heroin in your house, and that's how I would distinguish Jones. A neutral statement, when the state says, oh, it was a neutral statement, would be something like people versus, it was P-E-O, P-O, where the officer says, oh, what's wrong? That's a neutral statement because there can be a million, when somebody asks you what's wrong, I could say, you know, I woke up out of bed on the wrong side. It doesn't necessarily break Rhode Island versus Innis, which talks about, were there words or actions likely to elicit an incriminating response? And we have to remember that the agents had already been talking to him about illegal reentry and fake documentation. So I do think that they were purposely trying to use and establish his guilt using an oral statement at trial for knowledge. But after he made that statement and then they gave him Miranda, he went and, you know, told them everything. Right. Now, there could be the philosophy that at this point, the Miranda, but I'm... To that extent, Miranda doesn't give rise to the fruit of the poisonous tree doctrine, does it? No. No. Could you say that, you know, he had already given... Can harmless error apply to this analysis? Can it? No, I don't believe so, Your Honor. And I just wanted to say that I think it was purposeful. They're waiting for their questions, their seven-minute questioning before they gave him Miranda. And I just wanted to say one thing about sentencing because that was my last issue. I think the judge used four or five times the term sending a message to the community, and that is not... That's not an aggravating factor. A deterrence is. But we're taking away individualized sentencing. And also, he kept talking about the toxicity and the dangerousness of heroin. And that's kind of implicit. It's a Schedule I narcotic. So, and you're really not supposed to consider a factor inherent in the offense as a further factor in your aggravation. Because all we're doing is going in circles like a... Are you referring to the amount of heroin? Yeah, that was the issue. You know... Are you referring to the amount? He used the...kept talking about...he talked about dangerousness and toxicity when toxicity was never proven other than it was heroin. We never heard there was fentanyl or it was a waste. You know, and the statute is... You're not...your position is not that heroin alone is not toxic? Oh, no. Of course, it's a Schedule I narcotics. I...obviously. And...but our client is facing a de facto life sentence. Wait a minute. How old is he? He is now 48 years old. So, is it incumbent upon the courts to impose a lesser sentence when somebody is older and they may spend the rest of their life in prison? Of course not, but I also want to... So then how is it a de facto sentence? Unlike if you have a 15 or 16-year-old. Right. I mean, how is this de facto if he happened to commit a crime when he was 48? Correct, but it is a 15 to 60-year sentence. Our client did get the 60 with not a significant criminal history, not violence in his background. But didn't he commit basically the same offense, was deported, came back? Yes. He committed the same offense? Absolutely. So then how do we find that the trial court abused his discretion? Because we could look at the 402 conference, and I do feel that it is relevant to look at it, where a... But at the 402 conference, it was, and there were no new facts. The judge knew the amount of the heroin. You know, that's an interesting point. How do we really know what was discussed at a 402? It's not on the record. They come back out, make a cursory, okay, blah, blah, we had a 402, what date do you want? Yes. So how do we assume what was told or what was disclosed by both sides for that matter? By both sides, yes. Perhaps greater litigation than actually came to pass for, I mean, how do we know? How do we know what the 402 was? And the judge says, well, all right, I would do blah, blah, blah. But regardless of that, the trial court makes clear that the 402 conference, he is not bound by the recommendation. Absolutely, but in the case of People v. Dennis, the court did look at a 402 conference and the disparity between the 402 conference and the sentencing after a jury trial. And I do want to mention that... That was, they had concluded that they penalized the defendants for taking the jury trial. And it was... And ours is a stipulated, basically a stipulated bench trial that we felt that our client was, we do feel our client was penalized. And a 60-year sentence when mitigation was brought out about his cooperation. It did further the investigation. And, yes, we were hoping, yes, a remand for sentencing. Just as Dorrington pointed out, a 402 conference, many times it is to determine if the defendant engages in plea negotiations, will the trial court accept that? They talk about parameters. Well, following the 402, the defendant has his right to go to trial. Is there case law that says the court is bound to impose the same sentence that he indicated was acceptable on a plea? Is that the same problem? No, Your Honor. And I just want to say the stipulated bench trial was to preserve the Fifth Amendment and the Fourth Amendment motions. But that could be a factor that the state, you know, offers in terms of a plea agreement. You enter a plea agreement, there's no right to appeal. It's done. Yes, I understand that, Your Honor. Because if that was the law, it would be too many trial cases doing 402 conferences after that. Yes. And I understand the standard is great deference, but we believe there was mitigation. And some of the aggravating factors that the judge did look at are not truly aggravating factors in this case. Thank you. Thank you. All right, thank you. All right, Mr. Stevens, on behalf of the state. Good morning, Your Honors. And I will, of course, limit myself to responding to the defense points. The first one of which, of course, is the business of the initial approach to the defendant. It wasn't, couldn't have, technically, couldn't have been very incriminating or intimidating. Here come these three guys, t-shirts, weapons in their holsters. I'm glad you said that because I think they, I got the impression that the defense was saying the weapons were drawn, they were not. No, no. They were visible. They were visible. Right. As described in the record, the streets weren't blocked. The defendant wasn't prevented from parking his car, is my recollection. The officers were at some remove. It was for, you know, basically containing what could have been a dangerous situation, but they were not on top of him. The description of the interchange between the defendant and the three officers seemed to me to be consistent with a consensual approach. Can we talk to you, that sort of thing. How do you mean a consensual approach? Oh, I mean. Did he say, hey, officers, I want to talk to you? Rather than freeze, you know, hit the dirt cross your, you know, that sort of thing. It was a, it was the sort of approach that was not that intimidating. They walked up to him, they didn't grab him first. That's my point, exactly. There were no commands, you know, get on the ground or anything. Correct. That's what I was trying to say. Thank you. There was some discussion about whether or not it was even demonstrated that he was, he was subject to a frisk. Just briefly, let me say. I think at some point, let's face it, inevitably we're going to have to deal with that issue. The trial court, as you know, basically said, assuming the search or the pat down occurred. So for purposes of this appeal, why don't you proceed from the proposition it did occur? Right. You answer that question again. I think you've all been talking about the right question, attenuation. We cited Couliard and Evans. Not because they're really so much different. This is so much more recent. And it, it raised the notion that a Terry stuff is just that, it's a Terry stuff. I think the defense wants to take the position that a Terry stuff inevitably ripens into a full-blown arrest. This wasn't a Terry stuff, was it? How could this be a Terry stuff? Counsel said both sides did the same thing. I'm sorry. The first, right. And that, you know, the first of this was inevitably something that, you know, inevitably made this a non-consensual encounter. But. Okay, so we have a pat down. We're proceeding from the position that there was a pat down that the defendant did not consent to. He did invite the police to his house, obviously. So there's this pat down search of the defendant. And assuming that there was no basis, I mean, this was not a consensual encounter. It was not a Terry stuff. And assuming we find that to be a pat down without a legal underpinning, how does that get attenuated becomes, I think, the ultimate question moving forward. Well, nothing came out of the frisk. I've been through, I've been through TSA security, maybe you have. For some reason, they always give me a pat down. I don't really feel that that's a. Do you have one of those spaces? I'm sorry. You must look suspicious, Mr. This face looks suspicious to TSA, right? So it is a minimal thing that the public is subject to. Nothing came out of it. Yeah, but at the airport, you're asking to get on an airplane. You submitted to being first. If somebody thinks so. This is on my front lawn. And you come along and you want to frisk me. Where's the attenuation? Between that encounter and what, 10, 11, 12 minutes later, he's signing a consent to search. I don't think that there was any indication that the defendant thereafter thought he was under arrest. The statements of the officers, which were not really rebutted by the defendant. It was an amicable discussion. The family was not made to be in any particular place. They may have been asked to move for convenience sake. He wasn't led or dragged into the house. You're saying after this pat down, which they found nothing, they just walked into the house. Is that what you're saying? They didn't push him or drag him into the house, right? Right. Can I go back real quickly? You relied on that Colyard case. The Colyard, is that how you spell it? Yeah. Colyard case. Isn't that distinguishable? Didn't they find a bullet on the console before they patted him down? Right, they did. I do have to say that it's not. Just what I was saying before, it starts a discussion of understanding that the officers do have some right to a reasonable frisk for safety's sake. That's pretty much all I want to take out of that case. There are older cases where arguably, well, arguably, out of Taggart, for example, this court found that an illegally seized photograph that was shown to the defendant prior to getting his consent to search was not something that made it an involuntarily rendered consent because, this court said, that illegal conduct must be inextricably bound up with an allegedly illegal search. So that is the test that we agree. But so tell us why specifically the illegal conduct here, the legal seizure and the consent, or the legal seizure was attenuated. The illegal seizure of his body? Yeah. They let his body go. Nothing happened. It was a minor, it was too minor to. Let's assume for the sake of argument, we have an illegal detention. Right. Where's the attenuation? When the officers explained to him the consent to search form. I mean, to some extent, asking the consent implies that you don't have to give the consent. Mm-hmm. And how much time had passed, do you know, between that pat-down, alleged pat-down and the time you gave that consent? I do not recall that. It seemed to be short. It seemed like you would probably favor the defendant in all candor. It was a short time, wasn't it? Not particularly long, no. I would agree with that. So I think we've got a question of attenuation, and you know what you have to do. I think we've said. We know what we have to do, but we wanted to know what you think we should do because you're the attorney arguing for the other side. Well, exactly. And I think that you should say that it was attenuated if it existed. But why did we say. If it existed in the first place. Why should we say it was attenuated? Because it was just too minor of a touch. If you're requiring me to say that it occurred and that it was illegal, I would also point out there was plenty of reason. Does the giving of the consent form, doesn't that have something to do with this, Mr. Stevens? I'm sorry? Doesn't the giving of the consent form have something to do with this? The consent form that he signed later? Mm-hmm. Doesn't that bear any issue? Is that an intervening circumstance that the court's supposed to consider? Well, yes. I mean, he did give consent. And it was explained to him, you know, the terms of the form and where he was supposed to, you know, what areas were going to be searched. So do we have any further questions on this point? Any further questions? No. I thought I could move on to number two back behind. Okay. Number two. Where's my notes? Okay. Let's talk about the Fifth Amendment. Let's talk about his statement. Your opponent indicates that the statement about they talk and talk and then they go on and say, okay, now we want to speak with you about heroin that was found in your house. Mm-hmm. And then he says, oh, yeah, I have 7 or 8 kilograms. And then all of a sudden the Miranda form comes out. Right. That statement that he made prior to that, was that a statement given and received illegally because they set him up for that statement prior to giving him Miranda? What's your position about that? No. Because it was not a question. So we cite cases that say that general information can be discussed beforehand, biographical information, which arguably your immigration status is part of that. And then the reason why you're there. I think that our cases that we cite are pretty strongly indicate that this was not an interrogation of the Fifth Amendment. Isn't it a statement absolutely designed to elicit admission from the defendant? I'm sorry. That was the first part. Wasn't that statement by the police officers designed to elicit a confession or admission from the defendant? We're here to talk about the lost dog. We're here to talk about the heroin in your house. Well. Why not give Miranda before you make that statement? That's not the law. I mean, as I said, we have. Why isn't that a statement designed to elicit an admission? I think that. I mean, the position that you're positing sort of assumes. The statement the defendant made, in our view, was unexpected. We're here to. The defendant blurted it out. That was the evidence, as I, as I, as the state interpreted, as the judge seemed to interpret it. If you take that position, any officer who walks up to anybody in the street must start off with a Miranda warning. I mean. Wait a second. This is not on the street. This is in an interrogation room. The room is locked. Two police officers in there. He is clearly in custody. But I think it's. I mean, I think conceptually. I mean, my statement stands. The moment I walk into the interrogation room, I give you Miranda. I can't say. Would you like a cup of water? Oh, a cup of water. Now, that means that if I offer you a cup of water, I expect you to say something because your throat is going to be dried. And there's. I mean, you could. It's like this argument forever. No, but look at the P.O. case where the woman was. They said to her, what's wrong? And they said, well, she said, well, I've been taking drugs and drinking, blah, blah, blah, whatever. I mean, the court found that that was not a specific question. It was a broader question. What's wrong? Just like one glass of water. Right. The issue in this case is heroin. And the question was, we're going to talk to you about heroin found in your home. Correct. So isn't that a little bit distinguishable between your example of asking for a cup of water? It could be also interpreted as a declarative statement saying we're going to give you an opportunity to explain why someone else put heroin in your house. Fair enough. So then if that statement were disregarded, the statements that came pursuant to Miranda, are they cumulative? Oh, that was a question of the cat out of the bag, which I can't find the reference. I think it's from Ennis. As you, I believe, were pointing out earlier, the defendant made a statement. It doesn't seem that that statement really influenced his thinking after Miranda. He wanted to tell the statement. So, no, I don't think that what he said at that point. If I can call out the essence of what you're saying, both justices are asking you, was that thing we're here to talk to you about heroin, you're characterizing that as telling them why he was there to be talked to, reference an informational point of why we're here to talk to you, rather than something that is designed to directly incriminate somebody. Is that what you're saying? Yes. I'm trying to figure out the essence of what you're saying. Okay. All right. Well, just briefly with regard to sentencing, what about heroin? That's pretty much it in this case. Well, she's saying, and the law is very well settled, that you can't consider an aggravation effect if it's inherent in the crime you're convicted of. So how do you distinguish this from that principle? Why doesn't that principle apply to him? I believe that the judge was actually acting in court with Section 411 of the Controlled Substances Act, which invites him to make all of those inquiries. So you would understand. Offer delivery of a highly toxic controlled substance that's in there, unusually large quantities, and sales by a non-user to a user, which eventually this was in the drug pipeline. So you're saying that's? It wasn't. It's something the legislature said that this Court should consider. Okay.  I have nothing. All right. Thank you, Mr. Stewart. Thank you very much. Ms. Kodansky. Yes. One of the things to remember is that in state court, you can't do conditional pleas to preserve our constitutional Fourth and Fifth Amendment issues. So that was the basis of the reasoning for the stipulated bench trial. I also wanted to say that the officers, there was a parameter set up, and they also said that they approached our client quickly. It was a rushing of our client as he was exiting his vehicle. And by the sheer number of police officers present, I think that does take away the consensual nature. I also wanted to talk about what a protective pat-down does due to an individual. It makes you even more intimidated than you might have been previously prior to being touched. The environment, even on the street in front of your house, becomes more coercive after being given a cursory protective pat-down. You are certainly intimidated by that. Any reasonable person would be intimidated by that. And I think it's clear with the Supreme Court's holding and the codification of a Terry stop versus a Terry pat-down that you have to say that this individual is armed and dangerous and I fear for the safety of myself or fellow officers. There was never any testimony to that. So this even cursory protective pat-down was illegal. Talking about Miranda, it is the perception of the defendant. It is not the intent always of what the officer says to elicit an incriminating statement. It is clearly the perception of what the defendant would feel in an interrogation room, and there were three Homeland Security officers there. Also, one of the reasons that this whole encounter began is they were looking to get, obviously, inside the house or inside the garage, but they didn't have enough evidence for a search warrant. So we have to keep that in mind. It was only after narcotics, a gun, some packaging material was found was the search warrant then obtained. Going back to the Miranda violation, this whole thing could have been easily avoided upon introducing yourself when you enter an interrogation room and showing the Miranda warning. We wouldn't even be discussing this issue if there hadn't been this Miranda and purposeful. Miranda is supposed to protect and give the individual who is being interrogated some notion of his rights, and that was taken away from our client. What about his position that, you know, you're giving him information, you're telling him why you want to talk to him? Yeah, he did that. After receiving his Miranda warnings and signed off on the consent, then he did help to further the investigation, and it was mitigation and it was brought up in the sentencing. And he was also told prior to Miranda that leniency would be conveyed to the judge and the state's attorney's office by the three Homeland Security officers. Aren't defendants told that every day? Is that improper? Isn't that the rude method? You know, I've been doing this for 30 years. So, you know, a small drug case on the street, no, the defendant on the street with one gram is never going to be told. You know, you're just placed under arrest, same usually with a single gun recovered on the street. No, I don't believe every defendant is told your cooperation will lead to leniency. Wow, a big fish. But they probably don't think you're a big fish when you have one gram. No, exactly. That's why they're not saying that to someone with one gram. In this case, yes, he would have been a big fish. That's why they're saying it, and they said it, and then they immediately followed with that statement, we found heroin in your house. Let me ask you the same question that I asked Mr. Stevens. That if we didn't have that statement, I have 7 or 8 grams, we still have the whole statement that he gave from Miranda, which is really duplicative of what he said in the case. Absolutely duplicative, but really that statement, I have 7 or 8, is that element of knowledge that was needed in this precise case because they had the heroin. Since he was never seen in that detached garage and he was never seen walking into it, that was the one element of knowledge they needed for constructive possession. But once they gave him Miranda, he continued to go on and they had that knowledge from that statement that he was Miranda. But an individual with also a 6th grade education would have felt that it was already, you know, the words were out, it had already been done. So keeping that in mind, furthering at that point, you know, his mind might have been on the leniency argument that they had told him just minutes previously. That's trickery. Yes. Is it wrong? Is it illegal? The trickery was giving me Miranda by morning 7 to 8 minutes after being in the room, and those were not just breaking the ice or pedigree questions. That was the trickery. Thank you. Thank you, Ms. Podesta. I'd like to thank both counsel for the quality of their arguments here this morning. The matter will be taken under advisement and a written decision on this matter will issue in due course.